# In re APPRAISAL OF METROMEDIA INTERNATIONAL GROUP, INC.

## Civil Action No. 3351–CC.

Court of Chancery of Delaware.

Submitted: Jan. 30, 2009.

Decided: April 16, 2009.

See also 913 A.2d 593.

894

Stuart M. Grant, Geoffrey C. Jarvis, Diane T. Zilka, and Alessandra C. Phillips, of Grant & Eisenhofer, P.A., Wilmington, Delaware; Lawrence C. Ashby, Stephen E. Jenkins, Philip Trainer, Jr., Richard L. Renck, and Toni–Ann Platia, of Ashby & Geddes, P.A., Wilmington, Delaware, Attorneys for Petitioners.

Arthur L. Dent, Michael A. Pittenger, and Berton W. Ashman, Jr., of Potter Anderson & Corroon LLP, Wilmington, Delaware; of Counsel: Steven Klugman, Gary W. Kubek, Helen V. Cantwell, Eliza M. Sporn, Courtney M. Dankworth, and Andrea Glen, of Debevoise & Plimpton· LLP, New York, New York, Attorneys for Respondent.

### *OPINION*

CHANDLER, Chancellor.

In this consolidated appraisal proceeding, dissenting petitioners seek a judicial determination of the "fair value" of the 7.25% Cumulative Convertible Preferred Stock of respondent Metromedia International Group, Inc. ("MIG"). This litigation arises from the August 22, 2007 merger of

CaucusCom Mergerco Corp. ("Merger-Sub"), a wholly-owned subsidiary of CaucusCom Ventures, L.P. ("CaucusCom"), with MIG, in which MIG was the surviving entity. The merger occurred after MergerSub had already acquired in a tender offer approximately 77% of MIG's outstanding common shares. After the tender offer, the merger agreement between MIG, CaucusCom, and MergerSub granted MergerSub the option (referred to as the "Top–Up Option"), which MergerSub exercised, to obtain additional common shares from MIG in order to raise MergerSub's ownership stake to 90%. The Top–Up Option was followed by a short-form merger under 8 *Del. C.* § 253 in which the remaining common shares were cashed out, and which led to this appraisal proceeding.

MIG asserts that the highest value of the preferred shares is based on the preferred's being converted into common shares under the certificate of designation. According to MIG, the certificate of designation imposed limitations on the consideration that preferred holders would receive upon conversion, which tops out at $18.07 for each preferred share. In contrast, petitioners rely upon three different valuation approaches, which yield a range of values from $67.50 per share to $79.76 per share. They view their methodologies as vindicated by virtue of their "convergence" on the preferred stock's $79.76 redemption price under the certificate of designation, even though (as I determine) no redemption has ever occurred.

The case was tried before the Court on December 12, 15, 16, and 17, 2008. This is the Court's post-trial decision. After considering the record of over 220 exhibits, the testimony of one fact and three expert witnesses, and having weighed all of the evidence, I determine the fair value of MIG preferred shares on August 22, 2007 to be $38.92 for each share. I also award interest on this amount at the statutorily prescribed rate.

## I. FACTUAL OVERVIEW

### A. *MIG's Business, Pre–Appraisal Date*

In September 1997, when MIG issued the preferred shares, MIG's total enterprise value was approximately $1 billion. MIG owned all or part of telecommunications businesses in fourteen countries throughout Eastern Europe, the republics of the former Soviet Union, and other emerging markets. One of MIG's holdings was an indirect interest in Magticom, the leading mobile telephone company in the Republic of Georgia. MIG issued the preferred shares at a price of $50 per share, with a 7.25% annual dividend, payable quarterly in cash or common stock.

Until March 15, 2001, MIG had regularly paid quarterly dividends due to the preferred holders under the certificate of designation. At that time, however, it stopped paying dividends[1] because it faced liquidity pressures as a result of slumping performance in its company investments, burdensome overhead expenditures, and a significant outflow of cash as a result of the acquisition and development of its other businesses. These investments substantially depleted MIG's cash reserves. Following the suspension of its preferred dividend, MIG sold many of its nonessential businesses and significantly reduced its overhead expenditures.

In August 2005, MIG sold its interest in ZAO Peterstar, the leading fixed line tele-

---

1. If deferred, the dividends accumulate and compound at an annual rate of 7.25%. *See* Trial Ex. JX–7, 5.

phone operator in Russia, for $215 million in cash. A portion of the purchase price was used to pay off MIG's outstanding 10.5% senior notes, and another portion was used to increase MIG's stake in Magticom to 50.1%. From that point on, from September 2005 through the appraisal date, MIG has had no debt outstanding, and its main asset, Magticom, generated positive free cash flow.

Although MIG had excess cash generated from the sale of its assets, the reduction of its debt, and the dividend revenues it received from its controlling interest in Magticom, it did not resume paying its dividend to the preferred holders. As of the time of the Merger, the accrued and unpaid dividends totaled $121,732,028, or $29.40 for each preferred share.

Since 2005, MIG's principal asset has been its ownership of 50.1% of the stock of International Telcell Cellular LLC ("ITC"), which owns all the issued and outstanding common stock of Magticom. The remaining ownership stake of ITC was held primarily by Dr. George Jokhtaberidze, a Georgian national who founded Magticom. As of the appraisal date, Magticom maintained an approximately 50% share of the Georgian mobile telephone market and owned interests in three smaller telecommunications companies in Georgia: Ayety TV, a cable television provider, Telecom Georgia, a long-distance transit operator, and Telenet, a highspeed data communication and internet access service provider.

### B. *The Transaction*

Early in 2006, a group of investors expressed interest in purchasing MIG's share in Magticom. Under Delaware law and MIG's certificate of incorporation, a sale of all or substantially all of MIG's assets required the affirmative vote of a majority of the common shareholders.[2] MIG was advised that, due to its noncompliance with financial reporting requirements, it was prohibited from holding a meeting of its common shareholders to obtain approval of the proposed transaction. In order to effectuate an asset sale without a vote of its common shareholders, MIG proposed to file a voluntary bankruptcy petition and then seek reorganization under Chapter 11 of the United States Bankruptcy Code. According to MIG, a bankruptcy petition would not have required a vote by its common shareholders, but it would have to be approved by the preferred holders.

One of the offers MIG received was from Salford Capital Partners Inc. ("Salford"). Salford is a private equity investment management firm that specializes in the former Soviet Union and other Central and Eastern European countries. In October 2006, a consortium of buyers, including Salford, offered to purchase substantially all of MIG's assets for $480 million.

Because the bankruptcy reorganization required the approval of the preferred holders, MIG sought agreements with large holders of preferred shares as to an allocation of the potential sale proceeds. By October 1, 2006, approximately 80% of the preferred holders had agreed to support MIG's Chapter 11 plan of reorganization under which they would receive approximately $68 per preferred share, assuming that a transaction with the investor group was completed on the terms described in the letter of intent. Several common shareholders challenged the proposed transaction in this Court. On November 29, 2006, Vice Chancellor Stephen Lamb issued an order enjoining MIG

---

**2.** *See* 8 *Del. C.* § 271. Additionally, according to Section 8(g) of the certificate of designation, preferred holders of MIG have no right to vote on a merger.

from entering into an agreement to sell all or substantially all of its assets unless such agreement was subject to a vote of the common shareholders.[3]

Salford then conducted further due diligence; it concluded that MIG's assets were worth less than $400 million and withdrew its $480 million cash offer. In February 2007, Salford informed MIG that it would be prepared to make a tender offer for MIG's common shares at $1.80 per share. Sun Capital Partners Ltd., a United Kingdom principal investment group ("Sun"), joined Salford as a partner in the discussions with MIG regarding a tender offer.

Salford and Sun agreed with MIG to include a back-end merger as part of the transaction. The back-end merger would allow Salford and Sun to acquire all of the common shares at the same price and would enable MIG to avoid the substantial costs of completing its delayed public financial reporting and of continuing as a public company. Salford and Sun also understood that completing the merger would give preferred holders appraisal rights.

MIG's board retained Evercore Partners to provide an opinion as to whether the tender offer price of $1.80 per share was fair to the common shareholders. On July 13, 2007, Evercore delivered its opinion that the $1.80 per share cash offer from Salford was fair to MIG's common shareholders because $1.80 fell within the range of implied values of $1.05 to $2.58 per MIG common share.[4] Evercore did not express any opinion as to the fair value of the preferred shares. Based upon advice from Evercore and legal advisors re-

garding the various proposals that MIG had received, MIG's board concluded that Salford's proposed tender offer was superior to the proposals submitted by other potential acquirers.

On July 17, 2007, MIG's board entered into a merger agreement with CaucusCom pursuant to which MergerSub would conduct the tender offer for all outstanding common shares at $1.80 per share followed by a back-end short-form merger. Pursuant to the terms of the merger agreement, MIG gave MergerSub an option to purchase additional common shares that were authorized for issuance, but not issued and outstanding, following the completion of the tender offer, at the tender offer price of $1.80 per common share. The Top–Up Option could be exercised only if it would result in MergerSub owning in excess of 90% of the outstanding common shares. The merger agreement also provided that MergerSub would merge with and into MIG, with MIG continuing as the surviving corporation, provided that at least 61.3% of the issued and outstanding common shares were tendered and CaucusCom exercised the Top–Up Option to purchase additional shares of common stock.

The tender offer closed on August 21, 2007. At closing, MergerSub had acquired approximately 77.6% of the outstanding common shares, making CaucusCom, through MergerSub, the controlling shareholder of MIG. As soon as the tender offer closed, representatives of CaucusCom took control of the Board. On August 22, 2007, MergerSub exercised the Top–Up Option, which allowed it to effectuate the short-form merger. As part of the Top–Up Option, MergerSub paid MIG

---

3. *See Esopus Creek Value LP v. Hauf,* 913 A.2d 593 (Del.Ch.2006).

4. In fact, Evercore developed multiple price ranges, using different valuation techniques,

with prices ranging from negative 83 cents to $4.14 per common share. *See* Trial Ex. JX–118, 54–58.

$2 million in cash and issued an unsecured promissory note to MIG in the amount of $358 million in exchange for the additional 200 million common shares. Immediately after the Top–Up Option was exercised, MergerSub owned 280,151,574 common shares, giving it ownership of over 90% of MIG, and MIG held a promissory note for $358 million.

Following the exercise of the Top–Up Option, MergerSub merged into MIG, with MIG as the surviving entity. Immediately and as provided in the merger agreement: (1) all outstanding common shares not owned by MIG or MergerSub were cancelled and converted into the right to receive $1.80 in cash per share, (2) all outstanding common shares held by MIG and MergerSub were cancelled without consideration, and (3) each of MergerSub's 1,000 outstanding shares was converted into new common shares of MIG. The promissory note given by MergerSub was cancelled because the obligor (MergerSub) and the obligee (MIG) on the promissory note became the same entity, making the note a nullity. The preferred holders obtained the right to seek appraisal in accordance with their rights as defined in the certificate of designation.

## II. ANALYSIS

■ A preferred shareholder's rights are defined in either the corporation's certificate of incorporation or in the certificate of designation, which acts as an amendment to a certificate of incorporation.[5]

Thus, rights of preferred shareholders are contractual in nature and the "construction of preferred stock provisions are matters of contract interpretation for the courts."[6]

■ This proposition of contract interpretation for preferred stock is interwoven with a stockholder's statutory right of appraisal. Generally, in an appraisal action, this Court has broad discretion and uses a "liberal approach" in considering "all relevant factors involving the value of a company," to independently determine the "fair price" of the stock.[7] Narrowly interpreted "speculative elements of value," usually contemplated synergies or speculative *pro forma* projections, are eliminated from consideration.[8] Moreover, this Court will consider "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court."[9] Methods approved by this Court in determining fair value include the discounted cash flow valuation methodology, the comparable transactions approach, and the comparable company analysis. Each approach is dependent on the reliability of its inputs and is limited by the similarities between the companies or transactions being compared.[10]

■ In an appraisal proceeding, both parties bear the burden of proving their valuation conclusions by a preponderance of the evidence.[11] This Court may not adopt at the outset an "either-or" approach, thereby accepting uncritically the

---

**5.** *See Elliott Assocs., L.P. v. Avatex Corp.,* 715 A.2d 843, 852 (Del.1998).

**6.** *Matulich v. Aegis Commc'ns Group, Inc.,* 942 A.2d 596, 600 (Del.2008).

**7.** *Weinberger v. UOP, Inc.,* 457 A.2d 701, 713 (Del.1983).

**8.** *Id.*

**9.** *Id.*

**10.** *See, e.g., In re U.S. Cellular Operating Co.,* 2005 WL 43994, at *10 (Del.Ch. Jan. 6, 2005); *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 915 (Del.Ch.1999).

**11.** *See U.S. Cellular Operating Co.,* 2005 WL 43994, at *10.

valuation of one party, as it is the Court's duty to determine the core issue of fair value on the appraisal date.[12] Nevertheless, after having considered the parties' legal arguments and the respective experts' reports and testimony supporting their valuation conclusions, the Court has broad discretion either to select one of the parties' valuation models or to fashion its own.[13]

The law of Delaware governing contracts is clear: a valid contract will be enforced unless the contract violates public policy or positive law, or unless a party's non-performance is excused.[14] Given the contractual nature of preferred stock, a clear contractual provision that establishes the value of preferred stock in the event of a cash-out merger is not inconsistent with the language or the policy of § 262.[15] Thus, the most critical question in this action is whether the certificate of designation, which establishes the rights of MIG's preferred shares, contractually establishes the metric for valuing the preferred shares in the event of a merger. I conclude that it does, which effectively renders irrelevant many of the underlying disputes among the testifying experts over the competing valuation models.

Unlike common stock, the value of preferred stock is determined solely from the contract rights conferred upon it in the certificate of designation.[16] The only reported post-*Weinberger* opinion involving an appraisal of preferred stock, *In re Appraisal of Ford Holdings, Inc. Preferred Stock,* demonstrates the primacy of contract as the measure of the preferred's value.[17] There, former-Chancellor Allen analyzed the rights conferred upon preferred shareholders by the certificate of designation because, "[t]o the extent it possesses any special rights or powers and to the extent it is restricted or limited in any way, the relation between the holder of the preferred and the corporation is contractual."[18] When determining the fair value of preferred stock, therefore, I must first look to the contract upon which the preferred stock's value is based. In other words, the valuation of preferred stock must be viewed through the defining lens of its certificate of designation, unless the certificate is ambiguous or conflicts with positive law. As former-Chancellor Allen recognized in *Ford Holdings,* statutory appraisal rights can be modified or relinquished by contract, but in the case of unclear or indirect drafting, this Court will not "cut stockholders off from a statutory right" to judicial appraisal of their preferred shares.[19]

12. *Crescent/Mach I Partnership, L.P. v. Turner,* 2007 WL 1342263, at *9 (Del.Ch. May 2, 2007); *see also Gonsalves v. Straight Arrow Publishers, Inc.,* 701 A.2d 357, 361 (Del.1997) (noting this Court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action").

13. *See M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d 513, 526 (Del.1999).

14. *In re Appraisal of Ford Holdings, Inc. Preferred Stock,* 698 A.2d 973, 977 (Del.Ch.1997).

15. *Id.*

16. One of those rights, found in Section 2, forms the basis for MIG's argument that it is

not now (nor will it ever be) required to pay dividends to the preferred holders. Section 2.1 states that preferred holders are entitled to dividends only "when, as and *if* declared by the Board of Directors." Trial Ex. JX–7, 5. As I determine later, however, another section of the certificate expressly provides for payment of the accumulated and accrued dividends when a conversion event occurs under Section 8. *See infra* at 903–04.

17. *Ford Holdings,* 698 A.2d at 975.

18. *Id.* at 977.

19. *Id.* at 979.

Turning to the facts of this case, I conclude that MIG's certificate of designation clearly and unambiguously delimits the value to which preferred stockholders are entitled in the event of a merger. The certificate fixes the precise value to be paid to the preferred holders upon a merger event. I begin with Section 8(a) of the certificate of designation, which provides:

Each holder of Preferred Stock shall have the right, at its option, at any time and from time to time from the Issue Date to convert, *subject to the terms and provisions of this Section 8,* any or all of such holder's shares of Preferred Stock. In such a case, the shares of Preferred Stock shall be converted into such number of fully paid and nonassessable shares of Common Stock as is equal, *subject to Section 8(g),* to the product of the number of shares of Preferred Stock being so converted multiplied by the quotient of (i) the Liquidation Preference plus any Accumulated Dividends and any Accrued Dividends to and including the date of conversion divided by (ii) the Conversion Price (as defined below) then in effect, except that with respect to any share which shall be called for redemption such right shall terminate at the close of business on the date of redemption of such share, unless the Company shall default in performance or payment due upon exchange or redemption thereof. The Conversion Price shall be $15.00, subject to adjustment as set forth in Section 8(c).[20]

The rights granted to the preferred shares in Section 8(a), however, are "subject to" the provisions of Section 8(g). Turning to Section 8(g), it states in part:

In case of any capital reorganization or reclassification or other change of outstanding shares of Common Stock (other than a change in par value ... ) or *in case of any consolidation or merger* of the Company with or into another Person ... *each share of Preferred Stock then outstanding shall, without the consent of any holder of Preferred Stock, become convertible only into* the kind and amount of shares of stock or other securities (of the Company or another issuer) or *property or cash receivable upon such [merger] by a holder of the number of shares of Common Stock into which such share of Preferred Stock could have been converted immediately prior to such [merger]* after giving effect to any adjustment event. The provisions of this Section 8(g) and any equivalent thereof in any such certificate similarly shall apply to successive [mergers]. *The provisions of this Section 8(g) shall be the sole right of holders of Preferred Stock in connection with any [merger]* and such holders shall have no separate vote thereon.[21]

Section 8(g) effectively determines the value to be paid to preferred holders upon certain events. It is triggered by a merger, and the preferred holders' shares, without their consent, are to be valued as if they had been converted immediately before the merger. Here, a short-form merger followed immediately after the tender offer closed. Thus, the "sole right" available to MIG's preferred holders under the certificate of designation was the nonconsensual conversion procedure under Section 8(g).

Section 8(g) also defines the formula for determining the value of preferred shares upon a merger or like transaction:

[E]ach share of Preferred Stock then outstanding *shall, without the consent of any holder of Preferred Stock, become*

**20.** Trial Ex. JX–7, 12 (emphasis added).

**21.** *Id.* at 18 (emphasis added).

*convertible only into* the kind and amount of shares of stock or other securities ... or property or *cash receivable upon such [merger] by a holder of the number of shares of Common Stock into which such share of Preferred Stock could have been converted* immediately prior to such [merger] after giving effect to any adjustment event.[22]

This language defines the consideration to which preferred shares are entitled in a merger because it stipulates that the preferred "becomes convertible" into the cash received in the merger by the number of common shares into which the preferred holder "could have been converted" immediately before the merger. In this case, pursuant to Section 8(a), every preferred holder immediately before the merger could have converted each preferred share into 5.29 shares of common stock.[23]

In its own calculation, MIG erroneously substituted the conversion price calculated pursuant to Section 5.1 ($7.91)[24] into the conversion price variable given in Section 8(a). Section 8(a) clearly states, however, that it is subject only to the provisions of Section 8 and specifically provides the conversion price ($15.00) with which the conversion formula of Section 8(a) should be calculated. Thus, MIG's assertion that Section 8(g) fixes the conversion ratio of preferred shares to common shares at 10.038 is incorrect. The proper interpretation of Section 8(a) mandates a conversion ratio of 5.29 common shares for each preferred share.[25]

---

**22.** *Id.*

**23.** Following the conversion formula set forth in Section 8(a) of the certificate of designation, each preferred share equals "the product of the number of shares of Preferred Stock being so converted multiplied by the quotient of (i) the Liquidation Preference plus any Accumulated Dividends and any Accrued Dividends to and including the date of conversion divided by (ii) the Conversion Price." Mathematically, this formula equals: ($50.00 + $29.40) / ($15.00) = 5.29 common shares. The liquidity preference is given in Section 1.17 and is set at $50.00. Trial Ex. JX–7, 4.

**24.** Section 5.1 sets the conversion price upon a change of control. This price is equal to "the greater of (i) the Market Value for the period ending on the Change of Control Date and (ii) 66.67% of the Market Value for the period ending on September 10, 1997." Mathematically, this formula equals: $7.91 (66.67% × $11.87). Section 5.1 gives the preferred holder a "onetime" option to convert "upon occurrence of a change of control," but no preferred holder exercised this one-time option in this case. Thus, Section 5.1 does not apply. Instead, Section 8(g)'s non-consensual conversion in the event of a merger is calculated in accordance with Section 8(a), which expressly references Section 8(g). Applying the formula for conversion under Section 8(a), as I noted, yields the 5.29 ratio of common to preferred.

**25.** Despite the clear and inescapable language in the document that created their security, petitioners vigorously contend that since the certificate of designation is silent as to statutory appraisal rights under § 262, and since practically all of the preferred holders elected to seek appraisal of their preferred shares, the preferred holders must be entitled to a "fair value" determination using conventional appraisal methodologies, including the discounted cash flow methodology. Petitioners' argument, however, is flawed. As former-Chancellor Allen recognized in *Ford Holdings*, preferred shares are entitled to the value determined under the terms of their constitutive contract—unless ambiguity in the contract compels the Court to employ alternative valuation constructs to determine fair value. *Ford Holdings*, 698 A.2d at 975. Here, no ambiguity exists regarding the value to be paid to the preferred holders in the event they are forced ("without consent") into having their preferred shares converted in the event of a merger. In this litigation, of course, the preferred holders seek to extract additional value for their shares through the appraisal process even though it exceeds what the certificate defines as their right in the event of a merger or similar transaction. The rights of preferred holders, however, are clearly defined by the instrument (the certificate of designation) that created the security, and that instrument provides all the "fair

Importantly, Section 8(g) operates as a non-consensual conversion provision, treating the preferred on a merger event as though they have converted ("become convertible" and "which could have been converted"). It could not be more clear on this point: if there is a merger, the preferred holder must accept ("without consent") a conversion into common stock, calculated pursuant to the certificate's formula in Section 8(a).

Therefore, because the cash receivable upon the merger for each common share was $1.80, Section 8(a) sets the amount receivable after the merger for each preferred holder to $9.52 per share (1.80 × 5.29). Section 8(g), however, is not the only value-adding contractual provision triggered by the merger. Section 8(b) also mandates that:

> When shares of Preferred Stock are converted *pursuant to this Section 8, all Accumulated Dividends and all Accrued Dividends* (whether or not declared or currently payable) on the Preferred Stock so converted to (and not including) the date of conversion *shall be immediately due and payable,* at the Company's option, (i) in cash; (ii) in a number of fully paid and nonassessable shares of Common Stock equal to the quotient of (A) the amount of Accumulated Dividends and Accrued Dividends payable to the holders of Preferred Stock hereunder, divided by (B) the Market Value for the period ending on

the date of conversion; or (iii) a combination thereof.[26]

Since 8(g) is triggered by the merger, mandating the conversion of each preferred share into 5.29 common shares, 8(b) is also triggered, mandating the payment of the $29.40 in accumulated and accrued dividends. This provision 8(b) is applicable to Section 8 in its entirety and is not subordinate to Section 8(g).[27] Section 8(b) is incorporated into the calculation of value under 8(g) by the clear provision that Section 8(b) applies to *all* of Section 8.[28]

MIG argues that Section 8(b) is triggered only at MIG's option. I disagree. The language in Section 8(b), "at the Company's option," clearly does not refer to whether MIG has the option to pay the accumulated and accrued dividends, but rather that MIG has the choice between paying the accumulated and accrued dividends in cash or in stock. The phrase, "at the Company's option," immediately follows the phrase, "[w]hen shares of Preferred Stock are converted pursuant to this Section 8, all Accumulated Dividends and all Accrued Dividends ... on the Preferred Stock so converted to (and not including) the date of conversion shall be immediately due and payable."[29] Also, the phrase, "at the Company's option," immediately precedes the phrase, "(i) in cash; (ii) in a number of fully paid and nonassessable shares of Common Stock ..." Grammatically, this placement of the phrase, "at the Company's option," sug-

---

value" to which they are legally entitled in this appraisal proceeding.

**26.** Trial Ex. JX–7, 13–14 (emphasis added).

**27.** Section 8(b) applies whenever the preferred holders choose to convert their shares pursuant to any provision in Section 8. For example, if the preferred holders had exercised their option to convert their shares, outside the context of a transaction governed

by Section 8(g), such as Section 8(a), then 8(b) would also have applied.

**28.** Section 8(b) provides MIG with the option to pay the accumulated and accrued dividends in either cash or stock. Given that this is an appraisal proceeding, however, I order MIG to pay the accumulated and accrued dividends ($29.40) in cash.

**29.** Trial Ex. JX–7, 13.

gests that the phrase modifies the list of choices MIG has to pay the dividend—in either cash or in stock—and not whether MIG has the option to pay the accumulated and accrued dividends. If the phrase, "at the Company's option," was meant to modify the phrase preceding it, then it would have been placed at the beginning of Section 8(b). Furthermore, if the phrase, "at the Company's option," was meant to modify the preceding phrase and not the following list, then the list would be left dangling without any contextual modifier. In that case, the list would not be able to stand on its own as a sensible phrase. Therefore, logically, the phrase, "at the Company's option," must modify the list granting MIG the option to choose whether to pay the dividend in cash or in stock.[30] Section 8(b) clearly and unambiguously states that upon a conversion pursuant to any provision in Section 8, including Section 8(g), all accumulated and accrued dividends "shall be immediately due and payable." [31]

Turning briefly to the gist of petitioners' arguments, they insist that there are alternative value-adding provisions in the certificate of designation (other than Sections 8(g) and 8(b)) that were triggered by the merger. Specifically, they point to: (1) Section 7, granting the preferred shares a liquidation preference amounting to $50.00 for each preferred share, and (2) Section 3, granting MIG the right to redeem each preferred share at $50.00. Petitioners essentially ask this Court to award an appraisal value based on "hypothetical" scenarios—what preferred holders would have been entitled to had their stock been redeemed or had there been a liquidation event. Their expert's valuation models turn on assumptions about what an economically rational MIG board "ought" to do in the future—whether redeem or liquidate—in order to meet notions of an efficient capital market. These views are based on a fundamental misconception of the contractual obligations imposed by the certificate, a few examples of which should illustrate the fallacy of petitioners' position.

I turn first to the fallacy that the merger constituted a redemption under Section 3 of the certificate of designation. Section 3 defines the redemption value of the preferred shares by setting the redemption price at $50.00 for each share. Section 3.1 grants MIG the option to redeem the preferred shares. Under the certificate of designation, redemption would also trigger payment of the $29.40 in accrued and unpaid dividends.

Petitioners argue that redemption of the preferred shares will occur because it is likely that Salford will seek a liquidity

---

**30.** Even if I were to find Section 8(b) ambiguous, such that the phrase, "at the Company's option," is read to not clearly pertain to either the following list or the preceding phrase, I would still not agree with MIG's interpretation. The longstanding doctrine of *contra proferentem* would apply in this case. That is, when a contract is ambiguous as to its terms, the contract should be interpreted in favor of the non-drafting party or against the interests of the drafting party. In this case, MIG is the drafting party and is therefore responsible for any ambiguous drafting in the certificate of designation. Thus, if Section 8(b) were ambiguous, I would still interpret the ambiguity in petitioners favor. *Madison Real Estate Im-*

*mobilien–Anlagegesellschaft Beschrankt Haftende Kg v. Kanam*, 2008 WL 1913237, at *11 (Del.Ch. May 1, 2008) ("Under the doctrine of *contra proferentem*, ambiguities in a contract will be resolved against the drafter."). To be clear, however, in my view, Section 8(b) is not ambiguous and I reject MIG's interpretation that the phrase, "at the Company's option," means that MIG has the option to choose whether or not to pay the accumulated and accrued dividends in the event of a Section 8 conversion.

**31.** Trial Ex. JX–7, 13–14.

event for MIG in the next three to five years. Salford is a private equity investor. Robert Brokaw, petitioners expert witness, testified that a redemption period of three to five years is industry standard for private equity investors and provides the best internal rates of return on investments. Brokaw also opined that in the event Salford exits its investment in MIG, it would make no sense to keep the preferred shares in perpetuity and not pay dividends because defaulted securities in the capital structure will impair Salford's ability to achieve the highest multiple in a sale. Thus, the theory goes, Salford will leave money on the table when it attempts to exit its investment in MIG unless it voluntarily redeems the preferred shares and becomes current on the accumulated and accrued dividends.

The problem with this argument is that petitioners assume that Salford's exit will result in a redemption. In so assuming, they fail to consider various exit strategies available to Salford that would not require redemption of the preferred shares. For example, a potential buyer could enter into a transaction similar to the transaction Salford and MIG effectuated in this case, such as a tender offer and the purchase of the common shares directly from Salford. Alternatively, MIG could conduct an IPO of MIG or sell its shares in Magticom. Brokaw's assumption is thus speculative in that it assumes the probability of a future event, that is not certain to occur, and that has not occurred as of the appraisal date. Salford has every incentive to avoid entering into a transaction that would cause redemption of the preferred shares. Moreover, the preferred holders are only entitled to the value provided for in the certificate of designation. The certificate does not contemplate the probability of future events, regardless of the industry standard or what would amount to Salford's optimal outcome. The probability that redemption will occur seems remote, is at least speculative, and is not supported by the certificate of designation. Thus, it is no basis on which I may determine "fair value" in this appraisal proceeding.[32]

Petitioners further contend that the events of the merger constituted an effective redemption because the common shareholders received value ahead of the preferred holders in violation of the preferred's seniority in MIG's capital structure.[33] As I stated above, the events of the merger complied with the provisions of the certificate of designation. The common shareholders did not receive any value that violated any expressly contemplat-

---

**32.** I am not alone in my interpretation of the certificate of designation. In previous litigation concerning MIG, Vice Chancellor Lamb also commented on the terms of the certificate of designation. Notably, he wrote:

The terms of the preferred stockholders' certificate of designation do not provide them with the right to vote on a merger, combination, sale of all or substantially all assets, or any other corporate transaction that fundamentally changes the nature of the enterprise. In fact, the preferred stock, under the express terms of the certificate, was of a "perpetual" nature. Those stockholders had no right to mandatory redemption. Only an event of "liquidation" would entitle the preferred shares to be paid out

under the terms of their contract. Interestingly, a merger or sale of assets would not trigger the preferred shares' liquidation preference under the certificate of designation.

Vice Chancellor Lamb also pointed out that a transaction, such as the merger in this case, does not amount to redemption under the certificate of designation. To the extent I needed it, this is further authority that the "perpetual" nature of this certificate will allow Salford to enter into a similar transaction to exit MIG that would not trigger redemption under Section 3.1. *Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 601 n. 15 (Del.Ch.2006).

**33.** Trial Ex. JX–7, 3.

ed rights granted to the preferred under the certificate. If the parties had intended that a transaction, such as the merger, constituted an "effective redemption" of the preferred holders then they should have included language to that effect in the contract. The absence of such language in an otherwise clear and unambiguous contract leads me to the opposite conclusion—the events of the merger did not operate as an effective redemption of the preferred shares.

I turn finally, and briefly, to the liquidation value of the preferred shares under Section 7 of the certificate of designation. Section 7.1 provides:

> In the event of any liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, the holders of the shares of Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders up to the Liquidation Preference plus Accumulated Dividends and Accrued Dividends thereon in preference to the holders of, and before any distribution is made on, any Junior stock, including, without limitation, on any Common Stock.[31]

Petitioners argue that the merger resulted in a liquidation of MIG entitling the preferred shares to the liquidation preference of $50.00 for each share plus the accumulated and accrued dividends. This argument is equally without merit. "The right to be paid the amount due in the event of a liquidation or a redemption arises only in the circumstances specified in the preferred stock terms."[35] Section 7.2 of the certificate of designation specifically states that:

> Neither the sale, conveyance, exchange or transfer ... of all or substantially all the property and assets of the Company nor the merger or consolidation of the Company into or with any other corporation ... shall be deemed to be a liquidation, dissolution or winding up, voluntary or involuntary, for the purposes of this Section 7."[36]

Salford purchased the common shares of MIG pursuant to a tender offer, a Top–Up Option, and a § 253 short-form merger. Under a plain reading of the certificate of designation, these events have not resulted in a "liquidation," "dissolution" or "winding-up" of MIG. To the contrary, MIG continues as a going concern. No event triggering the liquidation provision has occurred, and thus to base valuation decisions on assumptions that it did would be error.

None of the alternative value-adding sections of MIG's certificate of designation have been triggered and, thus, these untriggered contract rights offer no non-speculative value upon which this Court is entitled to rely in an appraisal proceeding. Accordingly, the "sole right" available to the preferred holders in the event of merger, as explicitly set forth in the certificate of designation, is the nonconsensual conversion right under Section 8(g), which also triggered payment of the accumulated and accrued dividends under Section 8(b). As described above, that right, the preferred holders "sole right" under the certificate, yields a value of $38.92 per share of preferred stock. Preferred holders who acquired their stock in 1997 for $50 may be disappointed that ten years later their stock was worth only 78% of its original

---

**34.** Trial Ex. JX–7, 12.

**35.** 1 Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 4.12, 4–189 (2008).

**36.** Trial Ex. JX–7, 12.

issuance price, just as common stockholders who paid $12 in 1997 are no doubt disappointed to realize only 15% of their purchase price, but these consequences flow from the certificate and the market, not from the vagaries of financial methodologies applied in appraisal proceedings. Where the rights of preferred shareholders in the event of a merger are clearly stated in the certificate of designation, those shareholders cannot come to this Court seeking additional consideration in the merger through the appraisal process.

## III. INTEREST

The question of interest on an appraisal judgment has been mercifully simplified. In 2007, the Delaware General Assembly amended the appraisal statute to provide a simple default rule: a party shall be awarded interest from the date of the merger through the date of payment of the judgment compounded quarterly and accruing at 5.0% over the Federal Reserve Discount Rate as measured during that period of time.[37] This is the prescriptive statutory interest rate, unless good cause is shown to depart from it. Adopting a different rate may be justified where it is necessary to avoid an inequitable result, such as where there has been improper delay or a bad faith assertion of valuation claims.

 Here, petitioners have failed to demonstrate good cause to deviate from the statutory prescription. Although petitioners ask the Court to adopt an interest rate based on MIG's weighted average cost of capital on the appraisal date (which fell between 14% and 21.55%), this is not consistent with this Court's past practice in appraisal proceedings. Before the amendment to § 262 established the prescriptive interest rate, the Court generally calculated interest in appraisal cases based

on the average of the prudent investor rate and the company's cost of borrowing. No evidence was introduced at trial regarding the prudent investor rate and so I reject petitioners' approach to the interest question on that ground as well. More importantly, no reason exists to depart from the statutory interest rate. For example, petitioners cannot point to unreasonable or improper delay, as this matter was tried before the Court roughly one year after the first appraisal petition was filed, a remarkably short period of time by appraisal litigation standards. Nor have respondents asserted unreasonable or bad faith arguments in the valuation process. To the contrary, I find respondents' position to be correct, reasonable and (most comforting of all) based on contract. Accordingly, an award of interest at the statutory rate will sufficiently compensate petitioners.

## IV. CONCLUSION

I have considered carefully the expert witness opinions in this appraisal action, but I conclude that the provisions of the certificate of designation fix the value of the preferred shares on the merger date at $38.92. None of the alternative value creating provisions in the certificate of designation has been triggered by the merger, except the conversion provision in Section 8(g), which also triggered Section 8(b). Neither a liquidation event nor a redemption occurred.

The conversion provision in Section 8(g) of the certificate of designation provides the "sole right" to petitioners for valuing their preferred shares, which sets the amount receivable after the merger for each preferred holder to $9.52 per share. But Section 8(b) also triggers the payment of the $29.40 of accumulated and accrued dividends. Therefore, I conclude that "fair value" in this appraisal proceeding

---

**37.** *See* 8 *Del. C.* § 262(h).

amounts to $38.92 for each preferred share ($9.52 + $29.40) in accordance with the certificate of designation. I also award interest on the $38.92 per share judgment amount at 5.0% over the Federal Reserve Discount Rate from the appraisal date until final judgment is paid, compounded quarterly.

Counsel shall agree upon, and submit to the Court, an implementing form of Order within fourteen days from the date of this decision.