## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MGG SPV DUCK LP, directly, and derivatively on Behalf of all Nominal Defendants SHARI'S RESTAURANT GROUP, INC., and SHARI'S MANAGEMENT CORPORATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2025-0196-BWD |
| SAMUEL BORGESE, DANIEL SMITH, LESLIE CROOK, and GATHER HOLDINGS LLC, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SHARI'S RESTAURANT GROUP, INC., and SHARI'S MANAGEMENT CORPORATION, | ) ) ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION RESOLVING MOTION TO DISMISS

Date Submitted: October 21, 2025
Date Decided: November 19, 2025

John L. Williams, Brian C. Crawford, THE WILLIAMS LAW FIRM, P.A., Wilmington, DE; OF COUNSEL: Nicholas J. Rosenberg, Joshua W. Gardner, GARDNER & ROSENBERG, P.C., Boston, MA; *Attorneys for Plaintiff MGG SPV Duck LP*.

Andrew D. Kinsey, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Wilmington, DE; OF COUNSEL: Matthew Fox, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, New York, NY; *Attorneys for Defendants Samuel Borgese, Daniel Smith, Leslie Crook, and Gather Holdings LLC*.

**DAVID, V.C.**

Gather Holdings Guarantee LLC ("GHG" or the "Company"), a Delaware limited liability company, owned and operated "Shari's," a restaurant chain with locations in Oregon, Washington, and California. Beyond dining, Shari's locations in Oregon sold lottery tickets through video lottery terminals under a contract with the State of Oregon Lottery Commission.

MGG SPV Duck LP ("Plaintiff") agreed to invest $18 million in the Shari's Oregon business—including two subsidiary corporations through which GHG operated the Oregon side of its business—but not in the remainder of the enterprise. To facilitate Plaintiff's investment, GHG's limited liability company agreement was amended to create three distinct classes of membership interests. One class corresponded to Shari's restaurants in Oregon (including the lottery business), a second class corresponded to Shari's restaurants outside of Oregon (which did not include a lottery business), and a third class corresponded to the administrative side of the Shari's business. Plaintiff purchased membership units tracking GHG's Oregon business, acquired preferred stock in one of GHG's Oregon-side subsidiaries, and loaned additional funds to another of GHG's indirect subsidiaries.

Fourteen months after Plaintiff's investment, GHG's subsidiary defaulted and Plaintiff gained access to financial documents showing that assets from the Oregon business line had been spent to "prop up" GHG's other businesses. Plaintiff sued, alleging that officers of GHG and its subsidiaries breached their fiduciary duties,

aided and abetted breaches of fiduciary duty, and breached the implied covenant of good faith and fair dealing in GHG's limited liability company agreement.

For the reasons explained below, Plaintiff fails to adequately allege claims for breach of fiduciary duty to GHG and its members or breach of the implied covenant of good faith and fair dealing in GHG's limited liability company agreement, which exculpates officers from personal liability and leaves no gap for the implied covenant to fill. Plaintiff's complaint does, however, state a claim for breach of fiduciary duty to Plaintiff in its capacity as a preferred stockholder of GHG's corporate subsidiary. It is reasonably conceivable that the subsidiary's officers breached their duty of loyalty by causing the corporation to "loan" funds to GHG's other business lines, without security or any expectation that such funds could ever be repaid, in order to further the personal interests of GHG's Chief Executive Officer—who personally guaranteed loans to those other businesses that otherwise would have gone unpaid.

## I.      BACKGROUND[1]

### A.      The Shari's Business

"Shari's" was a restaurant chain with locations in Oregon, Washington, and California. Am. Compl. ¶¶ 4, 20, 27. Prior to October 2024, Shari's locations in

---

[1] The following facts are taken from Plaintiff's Verified Shareholder Direct and Derivative Amended Complaint (the "Amended Complaint") and the documents it incorporates by

Oregon also sold lottery tickets through video lottery terminals ("VLTs") under a contract with the State of Oregon Lottery Commission (the "VLT Contract"). *Id.* ¶ 21.

Defendant Samuel Borgese controlled the Shari's business through his 100% membership interest in Gather Holdings LLC ("Gather Holdings"). *Id.* ¶ 11. Gather Holdings owned 100% of the membership interests of GHG, a Delaware limited liability company. *Id.* ¶¶ 2, 25.

GHG operated three business lines. GHG owned and operated Shari's locations in Oregon (including the lottery side of that business) through Shari's CP LLC ("Shari's CP"). *Id.* ¶¶ 15, 24–25. Shari's CP owned Shari's Restaurant Group, Inc. ("SRG"), which in turn owned Shari's Management Corp. ("SMC"), both Delaware corporations. *Id.* ¶¶ 14–15. The parties refer to this side of the business as the "Oregon/VLT Business." *Id.* ¶ 22.

Separately, GHG owned and operated Shari's locations in Washington and California through Gather Intermediate Holdco LLC ("GIH"), which owned Shari's Non-Oregon Holdco LLC. *Id.* ¶ 27. The parties refer to that side of the business as

reference. Verified S'holder Direct and Deriv. Am. Compl. [hereinafter Am. Compl.], Dkt. 26; *see Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

the "Non-Oregon Business." *Id.*; *see* Am. Compl., Ex. A [hereinafter LLC Agt.] § 2.02(b). GHG also ran a management business that provided general administrative services for Shari's restaurants.

As of January 2024, Borgese served as the Chief Executive Officer ("CEO") of GHG, SRG, and SMC, and the manager of GHG and all the Non-Oregon Business subsidiaries. Am. Compl. ¶¶ 2, 27–28, 48. Defendant Daniel Smith served as the Chief Financial Officer ("CFO") of GHG, SRG, and SMC, and defendant Leslie Crook served as President of SMC.[2] *Id.* ¶¶ 1, 12–13.

## B.    MGG Invests In The Shari's Oregon Business.

After several years of disappointing financial results following the COVID-19 pandemic, Shari's needed capital. *Id.* ¶¶ 31–32, 34. MGG Investment Group LP ("MGG") found the lottery aspect of the Oregon/VLT Business attractive and agreed to invest in only that side of the Shari's business. *Id.* ¶¶ 33, 36–37.

On April 13, 2023, MGG, through Plaintiff, invested $18 million into the Oregon/VLT Business. *Id.* ¶¶ 38–41. MGG's investment was structured in three components. First, Plaintiff and SMC entered into a financing agreement (the "Financing Agreement") through which Plaintiff loaned SMC $14 million to refinance existing debt and to bolster SMC's balance sheet with $2.5 million in cash.

---

[2] This memorandum opinion refers to Borgese, Smith, Crook, and GHG collectively as "Defendants."

*Id.* ¶ 39. Second, Plaintiff and SRG entered into a stock purchase agreement under which Plaintiff paid $1.5 million to acquire 15,000 shares of SRG preferred stock, representing 15% of SRG's outstanding equity interests. *Id.* ¶ 40. Finally, under another agreement, Plaintiff paid $2.5 million to acquire a 29.4% membership interest in GHG that tracked the Oregon/VLT Business, as described in more detail below. *Id.* ¶ 41.

Borgese, through his 100% interest in Gather Holdings, retained a 70.6% interest in GHG's Oregon/VLT Business and a 100% interest in the Non-Oregon Business.[3] *Id.* ¶¶ 10, 41. The following image depicts the ownership structure of the Shari's business after Plaintiff's investment:

---

[3] As part of these transactions, MGG and Borgese executed a Non-Recourse Carveout Guaranty Agreement (the "Non-Recourse Guaranty"), under which Borgese guaranteed payment for all obligations owed to MGG pursuant to the Financing Agreement under certain circumstances. Am. Compl. ¶ 44.



*Id.* ¶ 29.

**C.    GHG's LLC Agreement Is Amended To Create Three Classes Of Membership Interests.**

To facilitate MGG's investment in the Oregon/VLT Business, Plaintiff and Borgese, as GHG's sole members, executed an Amended and Restated Limited Liability Operating Agreement of Gather Holdings Guarantee LLC (the "GHG LLC Agreement") to create three classes of membership interests, or "units," in GHG. *Id.* ¶¶ 46, 49.  The GHG LLC Agreement describes these classes of units as follows:

(i) *Oregon/VLT Units*.  Each "Oregon/VLT Unit" will represent an Interest solely in the Company's Oregon/VLT Business[4] and not in any other Business Line, will be designated as an Oregon/VLT Unit of the Company and will be entitled only to the Distributions with respect to the Oregon/VLT Units provided for in Article VIII.  Collectively, all of the Oregon/VLT Units represent the Company's entire interest in the Oregon/VLT Business.

(ii) *OtherCo Units*.  Each "OtherCo Unit" will represent an Interest solely in the Company's OtherCo Business[5] and not in any

---

[4] The GHG LLC Agreement defines "Oregon/VLT Business" to mean:

the Company's direct and indirect rights, title and interest in (i) those certain Shari's-branded restaurants in the State of Oregon that house video lottery terminals and other gaming activities including any such restaurants established after the date hereof and (ii) the related video lottery terminals and other gaming activities.  As of the date of this Agreement, the Oregon/VLT Business is currently conducted solely through the Company's interests in Shari's CP, LLC, a Delaware limited liability company, and its further Subsidiaries, Shari's Restaurant Group, Inc. and Shari's Management Corporation, each a Delaware corporation.

LLC Agt., App. I.

[5] The GHG LLC Agreement defines "OtherCo Business" to mean:

the Company's direct and indirect rights, title and interest in (i) certain Shari's-branded restaurants in the State of Oregon that do not house any video lottery terminals or other gaming activities including any such restaurants established after the date hereof, (ii) Shari's-branded restaurants outside of the State of Oregon including any such restaurants established after the date hereof and (iii) the operation of all other restaurants held directly or indirectly by the Company including any such restaurants established after the date hereof and related general administration of the Company and the Company Entities other than with respect to the Oregon/VLT Business and the Gather Management Business.  As of the date of this Agreement, the OtherCo Business is currently conducted solely through the Company's interests in Gather Intermediate Holdco LLC, a Delaware limited liability company, and its further Subsidiaries, including Gather Non-Oregon Holdco LLC and Coco's and Carrow's Holding Company, LLC, each a Delaware limited liability company.

LLC Agt., App. I.

7

other Business Line, will be designated as an OtherCo Unit of the Company and will be entitled only to the Distributions with respect to the OtherCo Units provided for in Article VIII. Collectively, all of the OtherCo Units represent the Company's entire interest in the OtherCo Business.

(iii) *Gather Management Units*. Each "Gather Management Unit" will represent an Interest solely in the Company's Gather Management Business[6] and not in any other Business Line, will be designated as a Gather Management Unit of the Company and will be entitled only to the Distributions with respect to the Gather Management Units provided for in Article VIII. Collectively, all of the Gather Management Units represent the Company's entire interest in the Gather Management Business.

LLC Agt. § 2.02(b); Am. Compl. ¶ 49.

Section 2.02(c) of the GHG LLC Agreement then provides that the assets and liabilities associated with a particular class of units "shall be held with respect to such Class," such that, for accounting purposes:

(i) the assets associated with a particular Class shall be held with respect to such Class. In the event that there are any assets, income, earnings, profits and proceeds thereof, or funds or payments which are not readily identifiable as assets held with respect to any particular Class (collectively, "General Assets"), the Board shall allocate such

---

[6] The GHG LLC Agreement defines "Gather Management Business" to mean:

the Company's direct and indirect rights, title and interest in Gather Management LLC, a Delaware limited liability company, which provides the general administrative services for the restaurants and other operations held by the Company within the Oregon/VLT Business. As of the date of this Agreement, the Gather Management Business is currently conducted solely through the Company's interests in Gather Management LLC, a Delaware limited liability company.

LLC Agt., App. I.

General Assets to, between or among all of the Classes equally and any General Assets so allocated to a particular Class shall be an asset held with respect to that Class. Absent bad faith or manifest error, each such allocation by the Board shall be conclusive and binding upon the Members of all Classes for all purposes;

(ii) the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Class shall be held with respect to such Class. In the event that there are any liabilities, debts, obligations, expenses, costs, charges and reserves of the Company that are not readily identifiable as being liabilities incurred with respect to any particular Class (collectively, "General Liabilities"), such General Liabilities shall be allocated and charged by the Board to and among any one or more of the Classes in such manner and on such basis as the Board, in its reasonable discretion, deems fair and equitable, and any General Liability so allocated shall be a liability held with respect to that Class. Absent bad faith or manifest error, each such allocation by the Board shall be conclusive and binding upon the Members of all Classes for all purposes. Notwithstanding the foregoing, any selling, general and administrative expense/allowance allocated to Gather Management LLC, a Delaware limited liability company for the Oregon/VLT Business ($2,000,000), as permitted in accordance with the documents executed in connection with the term loan made by MGG to Shari's Management Corporation, a Delaware corporation (the "Loan") and certain other agreements by and between MGG and Company Entities, will not adversely affect the Gather Management Business and/or OtherCo Business[.]

LLC Agt. § 2.02(c)(i)–(ii).

The parties further agreed to a management structure that gave MGG the right to appoint two of five managers to GHG's board of managers (the "Board"),[7] as well

---

[7] LLC Agt. § 3.01(a).

as the right to appoint two of three members on a committee (the "Oregon/VLT Committee") formed to make decisions on behalf of the Oregon/VLT Business:

> The Board hereby delegates all authority (other than Section 3.01(b)) with respect to the Oregon/VLT Business to a committee of the Board to be designated the "Oregon/VLT Committee" (the "Oregon/VLT Committee"). The Oregon/VLT Committee shall consist of three (3) individuals. Until the MGG $28 Million Payout has occurred, MGG shall have the right to appoint two (2) members of the Oregon/VLT Committee and Gather Holdings shall have the right to appoint one (1) member. After the MGG $28 Million Payout has occurred, MGG shall have the right to appoint one (1) member of the Oregon/VLT Committee and Gather Holdings shall have the right to appoint two (2) members. The Oregon/VLT Committee shall have oversight and input over the day-to-day operational services provided to the Oregon/VLT Business by the Gather Management Business. Generally, except as otherwise explicitly provided for in this Agreement, including, without limitation Section 3.05(b) of this Agreement, the Gather Management Business shall be delegated all authority to manage the day-to-day operations and decisions with respect to the Oregon[/]VLT Business. Notwithstanding the foregoing or anything to the contrary contained herein, the Oregon/VLT Committee shall have the authority to appoint Officers and Executive Officers with respect to the Oregon/VLT Business.

*Id.* § 3.05(a).[8] Notwithstanding those contractual rights, MGG did not appoint members to the Oregon/VLT Committee. *See* Am. Compl. ¶ 7.

---

[8] Section 3.05(b) states that decisions "shall not be considered day-to-day operational decisions under the purview of the Gather Management Business prior to the MGG $28 Million Payout, and the Oregon/VLT Committee acting alone, by majority vote, until such time, shall have the authority in respect of such decisions." LLC Agt. § 3.05(b).

In addition, the parties agreed in the GHG LLC Agreement to waive fiduciary duties for GHG's members and managers and to exculpate officers from personal liability for breaches of fiduciary and other duties.  LLC Agt. §§ 2.05, 3.04, 4.04.[9]

**D.    The Shari's Business Continues To Decline.**

Shari's financial condition did not improve after Plaintiff's investment.  Am. Compl. ¶ 59.

At some point, Plaintiff engaged a consultant to review the operations of the Oregon/VLT Business.  *Id.* ¶ 61.  Plaintiff's consultant opined that "the Oregon Business was suffering largely because of a complete abandonment of managerial oversight of the Oregon restaurants and refusal to utilize cash to support the

---

[9] Section 2.05 states that:

> [t]o the fullest extent permitted by applicable law, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company, and no Member shall be liable to the Company or any other Member for acting in good faith reliance upon the provisions of this Agreement.

LLC Agt. § 2.05.  Section 3.04 similarly states that:

> [e]xcept as specifically set forth in this Agreement, to the fullest extent under applicable law, no Manager or member of a Committee shall have any fiduciary or other duty to the Company, any Member or other party with respect to the business and affairs of the Company, and no Manager or member of a Committee shall be liable to the Company or any Member for acting in good faith reliance upon the provisions of this Agreement.

*Id.* § 3.04.  And Section 4.04 states that "[t]o the fullest extent permitted by applicable law, no Officer shall be personally liable to the Company or to its Members for acting in good faith reliance upon the provisions of this Agreement, or for breach of any fiduciary or other duty."  *Id.* § 4.04.

11

management and maintenance of those restaurants"; "Borgese had terminated numerous key management positions at the Oregon restaurants, including the Directors of Operations of the Oregon restaurants, initiated the closure of the Oregon administrative office, and directed the remaining staff to work virtually"; and "the neglect of management and oversight had led to inoperable equipment, non-functioning back of house management, unsafe and unsanitary working conditions for Shari's staff, and lack of training and high turnover, among others." *Id.* ¶¶ 61–63. Plaintiff's consultant "further determined that Borgese and Smith were intentionally limiting expenditures of capital on vitally needed maintenance and management of the Oregon/VLT Business, to feed the [N]on-Oregon side of Borgese's holdings." *Id.* ¶ 67.[10]

In the fall of 2023, Borgese relocated from Texas, where Shari's was headquartered, to South Carolina, and in January 2024, Borgese resigned as CEO of SMC. *Id.* ¶¶ 71, 73, 79.

---

[10] *See also* Am. Compl. ¶ 70 (alleging that Borgese "devot[ed] most of his time to shifting resources to and managing the Non-Oregon Business"); *id.* ¶ 76 ("Borgese directed the use of funds generated from and attributable to the Oregon/VLT Business, to prop up the Non-Oregon Business . . . ."); *id.* ¶ 77 (alleging Defendants "funnel[ed] SMC funds though GHG to pay down a term loan and receivables financing Borgese made and personally guaranteed to support his Non-Oregon Business restaurants"); *id.* ¶ 78 (alleging Borgese used "SMC and SRG assets, while neglecting the Oregon/VLT Business in which [Plaintiff] held equity as a shareholder of SRG, to pay down the Non-Oregon Loans on which Borgese had greater personal[] guarantee liability").

By June, SMC had defaulted on its obligations to Plaintiff under the Financing Agreement. *Id.* ¶¶ 90, 93–94. MGG issued a notice of default to SMC on June 10 and exercised a contractual right under the Financing Agreement to appoint nonparty Jeff Marwil as interim manager of GHG and its subsidiaries. *Id.* ¶¶ 94–95. But weeks later, on June 28, Marwil resigned. *Id.* ¶ 98. MGG amended the GHG LLC Agreement to "provide Gather Holdings with the authority to appoint a successor manager for GHG," and Gather Holdings then reappointed Borgese "as Sole Manager of GHG and its subsidiaries." *Id.* ¶¶ 100–01.

MGG eventually "gained access" to financial documents that showed "Defendants had been drawing on [a] commingled account to pay expenses of the Non-Oregon Business, and partially recording those debits as credits on the Oregon/VLT Business's balance sheets, but without any actual transfer of cash to balance that account." *Id.* ¶¶ 107, 110. An outside consultant also told MGG that "Defendants had been regularly paying substantial payroll and other expenses of the Non-Oregon Business from a single Wells Fargo Account commingled with SMC and SMC's cash receipts." *Id.* ¶ 109. The Amended Complaint "estimate[s] that the Defendants, in operating SMC and the other businesses under Gather Holdings and GHG, allowed more than $3.3 million in expenses of the Non-Oregon Business to be drawn on the commingled Oregon/VLT Business accounts." *Id.* ¶ 115.

13

By October, SMC owed the State of Oregon Lottery Commission over $200,000 under the VLT Contract. *Id.* ¶ 146. The Lottery Commission "informed Borgese that if payment was not made and a bond was not posted," the Lottery Commission would terminate the VLT Contract. *Id.* ¶ 149. SMC did not make the payment and the Lottery Commission terminated the VLT Contract thereafter. *Id.* ¶¶ 150, 155.

On October 17, Borgese notified MGG that GIH had assigned Shari's Non-Oregon Business assets for the benefit of GIH's creditors. *Id.* ¶¶ 133, 151. Four days later, on October 21, Borgese resigned as manager of GHG and informed MGG that all Shari's locations in Oregon had been closed. *Id.* ¶¶ 153, 157.

### E.     Procedural History

On November 13, MGG filed a lawsuit against Borgese, Gather Holdings, GHG, Shari's CP, SRG, and SMC in the Supreme Court of New York, seeking damages under the Non-Recourse Guaranty and Financing Agreement. *MGG Inv. Gp. LP v. Gather Hldgs., LLC*, 2025 WL 776144, at *1 (N.Y. Sup. Ct. Mar. 11, 2025). On March 11, 2025, the Supreme Court of New York dismissed MGG's claim against Borgese for breach of the Non-Recourse Guaranty. *See id.* at *6–7.

On February 21, Plaintiff initiated this action through the filing of a Verified Shareholder Direct and Derivative Complaint (the "Initial Complaint"). Dkt. 1. Defendants moved to dismiss the Initial Complaint, and on June 3, Plaintiff filed the

14

operative Amended Complaint. Dkts. 24, 26. On June 27, Defendants moved to dismiss the Amended Complaint (the "Motion to Dismiss").[11] The Court heard oral argument on October 21. Dkt. 35.

## II. ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

### A. Count II For Breach Of Fiduciary Duty At GHG Is Dismissed.

Count II of the Amended Complaint alleges that Borgese[12] and Smith breached their fiduciary duties as officers of GHG by "favoring the Non-Oregon

---

[11] *See* Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Am. Compl. [hereinafter DOB], Dkt. 29; Pl.'s Opp'n to Defs.' Mot. to Dismiss the Am. Compl. [hereinafter PAB], Dkt. 31; Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss the Am. Compl. [hereinafter DRB], Dkt. 33.

[12] The Amended Complaint also alleges that Borgese and Gather Holdings breached their fiduciary duties in their capacities as a manager and "controlling member" of GHG. Am.

15

Business at the expense of the Oregon/VLT Business" and by "knowingly allowing and assisting" the "commingling [of] funds and utilizing Oregon/VLT Business funds to prop up the Non-Oregon Business[.]" Am. Compl. ¶¶ 182–89.

"Section 18-1101(e) of the Delaware Limited Liability Company Act . . . permits the parties to an operating agreement to eliminate or limit a[n] [officer]'s liability for breaches of the contractual and fiduciary duties they owe." *DG BF, LLC v. Ray*, 2021 WL 776742, at *9 (Del. Ch. Mar. 1, 2021); 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager *or other person* . . . .") (emphasis added). Here, the GHG LLC Agreement limits officers' personal liability for breaches "of any fiduciary or other duty" "[t]o the fullest extent permitted by applicable law." LLC Agt. § 4.04.

"Exculpation to the 'maximum extent permitted under the [LLC] Act' . . . requires dismissal of fiduciary duty and contract claims against exculpated [officers] where the claims seek only monetary damages . . . ." *DG BF, LLC*, 2021

---

Compl. ¶ 182. As Defendants argue, however, Sections 2.05 and 3.04 of the GHG LLC Agreement waive fiduciary duties for managers and members. DOB at 13–15. MGG offers no response, pivoting instead to argue that Borgese acted in his capacity as an officer of GHG. Tr. of 10-21-2025 Oral Arg. On Defs.' Mot. to Dismiss the Am. Compl. [hereinafter Tr.] at 34:15–19 ("What we're alleging . . . is that Borgese on his own was directing these activities. And he could only do those in his capacity as an officer.").

16

WL 776742, at *10 (first alteration in original). Although Plaintiff argues that the exculpation provision does not foreclose equitable relief, such as rescission or imposition of a constructive trust, Count II seeks only money damages for Borgese and Smith's alleged breaches of fiduciary duty. PAB at 13–14; Am. Compl. at 38.

Plaintiff also points out that the exculpation provision does not "eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 *Del. C.* § 18-1101(e); PAB at 11. As explained next, however, the Amended Complaint fails to allege a breach of the implied covenant of good faith and fair dealing. As a result, Count II must be dismissed.

**B.      Count III For Breach Of The Implied Covenant Of Good Faith And Fair Dealing In The GHG LLC Agreement Is Dismissed.**

Count III of the Amended Complaint alleges that Borgese and Gather Holdings breached the implied covenant of good faith and fair dealing in the GHG LLC Agreement by "direct[ing] the use of funds from the Oregon/VLT Business to the Non-Oregon Business[.]" Am. Compl. ¶¶ 191–96.

The implied covenant of good faith and fair dealing is a "limited and extraordinary legal remedy" that is "'best understood as a way of implying terms in [an] agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec v.*

17

*Shrader*, 991 A.2d 1120, 1128 (Del. 2010)); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).  Because the implied covenant serves as a gap filler, "[t]he logical first step in assessing an implied covenant claim is to determine whether the contract has a gap." *Khan v. Warburg Pincus, LLC*, 2025 WL 1251237, at *6 (Del. Ch. Apr. 30, 2025).  If the contract addresses the matter, there is no gap for the implied covenant to fill.  The "implied [covenant of] good faith cannot be used to circumvent the parties' bargain" when "[e]xisting contract terms control." *Dunlap*, 878 A.2d at 441.

Plaintiff asserts that the GHG LLC Agreement includes an implied term that Defendants will not "implement the agreement in a way that favors their interest over those of [Plaintiff]" by using funds from the Oregon/VLT Business to pay expenses associated with the Non-Oregon Business.  PAB at 20.  The problem for Plaintiff is that the GHG LLC Agreement contains multiple express provisions reflecting the parties' bargain over how to distribute funds from, account for, oversee, and make decisions on behalf of, GHG's business lines, including the Oregon/VLT Business.  For example:

- Section 2.02(b) distinguishes between GHG's three classes of units and provides that unit holders for a particular class "will be entitled only to the

Distributions with respect to" the business line associated with that class. LLC Agt. § 2.02(b).

- Section 2.02(c) dictates how GHG must "allocate" assets and liabilities "with respect to any particular Class" for accounting purposes. *Id.* § 2.02(c)(i)–(ii).

- Section 3.05 delegates certain oversight and decision-making authority to a three-person Oregon/VLT Committee, comprising two members appointed by Plaintiff. *Id.* § 3.05(a)–(b).

- Section 8.02(a)(iii) governs the distribution of "Available Oregon/VLT Cash to the Oregon/VLT Members in proportion to their respective number of Oregon/VLT Units." *Id.* § 8.02(a)(iii).

- But Section 3.03(b) also authorizes the Board to adopt "procedures as it may deem appropriate to operate and manage [GHG], including making decisions regarding the use or investment of [GHG's] capital, budget of [GHG], financings, dispositions of [GHG]'s assets and other [GHG] business." *Id.* § 3.03(b).

Notably missing is any express prohibition on GHG expending cash for any particular purpose, including to benefit other parts of the business. "If the parties wanted to include additional protections" to limit how funds could be spent, they could have bargained for such language. *Khan*, 2025 WL 1251237, at *7. But as it stands, the parties' carefully negotiated contractual arrangement leaves no gap to fill.

19

Plaintiff's reliance on *Whitestone REIT Operating Partnership, L.P. v. Pillarstone Capital REIT*, 2024 WL 274228 (Del. Ch. Jan. 25, 2024), is misplaced. In that case, the Court found that terms in a partnership agreement granting the plaintiff a redemption right implied a "corresponding condition" that the defendant would not "engage in self-interested conduct to frustrate" the plaintiff's redemption right. *Id.* at \*6. Here, Plaintiff does not identify any express right that Defendants have frustrated. Instead, in an effort to alter a carefully negotiated relationship crafted to facilitate Plaintiff's investment in a subset of GHG's assets, Plaintiff appeals to an overarching "intent[] to prevent actions that favor one side of the business at the expense of the other." PAB at 22–23. "The implied covenant cannot be wielded to rewrite the LLC Agreement or grant the plaintiff[] rights [it] never bargained for." *Khan*, 2025 WL 1251237, at \*7.

Because there is no gap in the GHG LLC Agreement for the implied covenant to fill, Count III is dismissed.

### C. The Motion To Dismiss Count I For Breach Of Fiduciary Duty At SRG And SMC Is Denied.

Count I of the Amended Complaint alleges that Borgese breached his fiduciary duties as an officer and "de facto manager" of SRG and SMC, Crook breached her fiduciary duties as an officer of SMC, and Smith breached his fiduciary duties as an officer of SRG and SMC, "by using funds of SMC and SRG for the benefit of the Non-Oregon Business" or "knowingly allowing and assisting" the

20

"commingling [of] funds and utilizing Oregon/VLT funds to prop up the Non-Oregon Business." Am. Compl. ¶¶ 171–80.

To state a claim for breach of fiduciary duty, a plaintiff must plead "(1) the existence of a fiduciary duty owed by the defendant to the plaintiff and (2) a breach of that duty." *Deane v. Maginn*, 2022 WL 16557974, at *13 (Del. Ch. Nov. 1, 2022). The Amended Complaint alleges that Borgese, Crook, and Smith each served in officer roles at SMC. Directors and officers of a wholly-owned subsidiary are "obligated . . . to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1208–09 (Del. Ch. 2010). In the present case, SMC's officers owed duties to its parent, SRG. They also conceivably owed duties to Plaintiff as SRG's sole preferred stockholder.[13]

---

[13] A corporation's fiduciaries may owe duties to preferred stockholders in some instances, including

> in cases where nonexistent contractual rights leave "the holder of preferred stock [in an] exposed and vulnerable position vis-à-vis the board of directors." Thus, if preferred stockholders "share a right equally with the common shareholders the directors owe the preferred shareholders the same fiduciary duties they owe the common shareholders *with respect to those rights*."

*Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7 (Del. Ch. May 28, 2010) (alteration in original) (first quoting *LC Cap. Master Fund, Ltd. v. James*, 990 A.2d 435, 448 (Del. Ch. 2010); then quoting *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010)). The parties here did not submit a copy of SRG's certificate

The Amended Complaint alleges that Borgese breached his duty of loyalty by using SMC's assets to further his personal interests, to the detriment of SMC and, indirectly, SRG. Specifically, the Amended Complaint alleges that Borgese "limit[ed] expenditures of capital on vitally needed maintenance" at SMC and SRG so that he could instead use those funds to pay expenses for the Non-Oregon Business, including "a term loan and receivables financing [that] Borgese made and personally guaranteed . . . ." Am. Compl. ¶¶ 67, 77. The transfers were later recorded as "'intercompany' loans from SMC to the Non-Oregon Business[,]" made without security or "any expectation they would be repaid." *Id.* ¶¶ 119–21. The allegations of the Amended Complaint support a reasonably conceivable inference that Borgese committed self-dealing by transferring funds out of the corporation to avoid personal liability, and that Crook and Smith acted at his behest,[14] supporting a claim for breach of the duty of loyalty.

---

of incorporation, but it is reasonably conceivable at the motion to dismiss stage that the contractual rights of the preferred do not address the conduct at issue in Count I, such that SMC's officers "owe[d] preferred shareholders the same fiduciary duties they owe[d] the common stockholders." *Id.*

[14] Am. Compl. ¶ 78 (alleging that "Borgese, with the knowledge and assistance of Crook and Smith," used SMC and SRG assets "to pay down the Non-Oregon Loans" that Borgese personally guaranteed); *id.* ¶ 73 (alleging that Crook took charge of "day to day management of SMC"); *id.* ¶ 76 (alleging that Smith, as CFO, "concealed the commingling on the financials reported to GHG and" Plaintiff).

Defendants argue that "there are no allegations that any of the Defendants took any actions in their capacity as fiduciaries to SMC or SRG," rather than in their capacities as fiduciaries of GHG. DOB at 28–29 (citing cases requiring a plaintiff to plead conduct taken in an individual's capacity as an officer if directors' breaches of care are exculpated). According to Defendants, all purported wrongdoing "took place at the GHG-level," where fiduciary duties have been eliminated. DRB at 10. This argument does not support dismissal for two reasons. First, it conflicts with the Amended Complaint, which adequately alleges wrongdoing at SMC. *See, e.g.*, Am. Compl. ¶ 77 (alleging "funneling" of *SMC* funds); *id.* ¶ 119 (alleging "'intercompany' loans from *SMC*") (emphasis added).[15] Second, Defendants' "capacity" distinction does not comport with longstanding Delaware law holding that "[t]here is no dilution of [a fiduciary's] obligation where one holds dual or multiple directorships, as in a parent-subsidiary context." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). Individuals who act in a dual capacity for two corporations, "one of whom is parent and the other subsidiary, owe the same duty of

---

[15] Defendants assert that the alleged misconduct must have occurred at the GHG-level because the Amended Complaint refers to "**GHG's** 'single Wells Fargo Account.'" DRB at 11 (alteration in original). The Amended Complaint does not allege that the Wells Fargo account was a GHG account, however, and it is reasonably conceivable that assets were transferred from SMC's accounts. *See* Transmittal Aff. of Andrew D. Kinsey in Supp. of Defs.' Opening Br. in Supp. of their Mot. to Dismiss the Am. Compl., Ex. 1 at 9 (showing a $1,020,520.57 transfer into SMC's Wells Fargo account).

good management to both corporations, and in the absence of an independent negotiating structure . . . or the [individual's] total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies." *Id.* at 710–11. Defendants cannot avoid their duties as SMC and SRG fiduciaries by claiming they were acting solely in their GHG capacities.

Defendants also suggest that when the parties structured their commercial relationship, they intended to limit Defendants' fiduciary liability, which is why the GHG LLC Agreement eliminated fiduciary duties for managers and includes exculpation provisions for managers and officers.[16] That argument fails to consider that the parties also chose to structure Plaintiff's investment to include equity securities in a Delaware corporation, where "fiduciary duties cannot be eliminated."[17] *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*,

---

[16] *See* DOB at 17 n.3 ("[Plaintiff] knowingly agreed to a governance structure where executives and managers/directors would not be subject to fiduciary duty liability.").

[17] Defendants cite *Trenwick America Litigation Trust v. Ernst & Young* for the proposition that Plaintiff cannot allege a breach of fiduciary duty in its capacity as a preferred stockholder of SRG as an "end-run around" GHG's fiduciary duty waivers. DOB at 17; *see Trenwick Am. Litig. Tr. v. Ernst & Young*, 906 A.2d 168, 194 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007). In *Trenwick*, the Court held that a stockholder could not bring a derivative suit against fiduciaries of a corporation's wholly owned subsidiary to avoid exculpation provisions at the parent level. *Id.* at 191, 194, 200–01. Here, however, Plaintiff does not only own a membership interest at the parent (GHG) level; it also owns preferred shares at the subsidiary (SRG) level. *Trenwick*'s logic therefore does not apply.

2025 WL 1642064, at *7 (Del. Ch. June 10, 2025). Plaintiff's breach of fiduciary duty claim is consistent with that bargain. The Motion to Dismiss Count I is denied.

### D. Count IV For Aiding And Abetting Is Dismissed.

Count IV alleges that, to the extent Borgese was not a fiduciary during any relevant time, he aided and abetted Crook's breaches of fiduciary duty. Am. Compl. ¶ 202. The parties now agree that Borgese was a "fiduciary at all [relevant] times." Tr. at 24:2–11, 37:17–23. "Conduct by a fiduciary . . . that would amount to aiding and abetting is instead an independent breach of that fiduciary's duties." *OptimisCorp v. Waite*, 2015 WL 5147038, at *79 (Del. Ch. Aug. 26, 2015) (citing *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *13 & n.78 (Del. Ch. Nov. 3, 2014)). Because a fiduciary cannot aid and abet a breach of fiduciary duty, Count IV is dismissed.

## III. CONCLUSION

For the reasons explained above, the Motion to Dismiss Count I of the Amended Complaint is DENIED. The Motion to Dismiss Counts II, III, and IV of the Amended Complaint is GRANTED.

25